# **EXHIBIT A**

IN THE CIRCUIT COURT FOR BALTIMORE COUNTY, MARYLAND

| | |
|---|---|
| SINCLAIR, INC., <br> 10706 Beaver Dam Road <br> Hunt Valley, MD 21093-2264 <br><br> Plaintiff, <br><br> vs. <br><br> CONTINENTAL CASUALTY COMPANY <br> 151 N. Franklin Street, <br> Chicago, Illinois 60606 <br><br> and <br><br> STARR INDEMNITY & LIABILITY COMPANY, <br> 399 Park Avenue 8th Fl, <br> New York, NY 10022 <br><br> Defendants. | Civil Action No. _____ <br><br> **JURY DEMAND** <br><br> **COMPLAINT FOR:** <br> 1. **BREACH OF CONTRACT** <br> 2. **DECLARATORY JUDGMENT** <br> 3. **LACK OF GOOD FAITH** |

## COMPLAINT

Plaintiff Sinclair, Inc. f/k/a Sinclair Broadcast Group, Inc. ("Sinclair") brings this action for declaratory judgment and breach of contract against Defendants Continental Casualty Company ("CNA") and Starr Indemnity & Liability Company ("Starr") (collectively, the "Defendant Insurers"), and against CNA for its failure to act in good faith, demanding a trial by jury, and as its Complaint alleges as follows:

### NATURE OF THE ACTION

1. This action arises from Defendant Insurers' refusal to pay Sinclair's insurance coverage claim for a ransomware incident and disruption that began in October 2021.

1

2. Sinclair's claim is covered by its cyber insurance program in which Defendant Insurers CNA and Starr participated as, respectively, third-layer and fourth-layer excess follow-form insurers. The primary insurer and two excess insurers whose policies afford coverage below the Defendant Insurers' policies have paid their full policy limits towards Sinclair's claim.

3. Defendant CNA initially acknowledged that Sinclair's claim exhausted CNA's excess policy. CNA's forensic accountants recognized in writing that Sinclair's claim "is **above $50M**," and they provided an initial report substantiating exhaustion of CNA's excess policy as well as Sinclair's entire cyber insurance tower, including Starr's excess policy.

4. In fact, in early 2023 CNA offered repeated assurances that it would soon pay its policy limits in satisfaction of Sinclair's claim. After the primary and lower-layer insurers had paid their policy limits, Sinclair's broker asked CNA about the status of CNA's payment. In December 2022, CNA responded that Sinclair's claim was "working through the proper channels" and on January 6, 2023, CNA's representative wrote that "I am told that I will have the go ahead by the end of January at the latest." CNA requested Sinclair's wire instruction details in order to make the payment, which Sinclair's broker promptly provided.

5. On January 31, 2023, CNA's representative assured Sinclair's broker that CNA's payment would "absolutely happen" in February 2023. CNA's representative stated that payment "will absolutely happen [on] February 22d and then we should be able to [over]night a check on that same day," that "I'm told by my manager who I just spoke with earlier today" that payment would be by overnight check not wire "for this $10 million payment that we plan to make," and "I also want to reassure that <u>the delay on our end is nothing to do with any sort of issue with the amount. . . . we're not questioning the amount</u>," and "it's the expectation that it's our . . . full $10 million limit." (Emphasis added.)

6. After repeatedly promising Sinclair imminent payment, Defendant CNA went silent for more than eight months. Then, on October 18, 2023, CNA provided Sinclair with a revised business interruption valuation report. This revised report, from CNA's same forensic accountant, now purported to value Sinclair's business interruption claim at **only $10.8 million**, which was well below the attachment point of CNA's excess policy (and below the attachment point of other excess insurers who had paid Sinclair's claim). CNA has provided no justification or explanation for its actions or position (including no coverage denial or substantive reservation of rights), nor anything to tie its revised valuation to any operative policy language. CNA's position is neither appropriate nor undertaken in good faith, nor does it reflect an informed judgment based on honesty and diligence.

7. Sinclair accordingly brings this action for declaratory relief, money damages, expenses and litigation costs, and interest, for breach of contract and failure to act in good faith by Defendant CNA. Sinclair brings this action against Defendant Starr, which has refused to cover Sinclair's claim until CNA pays, for declaratory relief and breach of contract.

8. Sinclair seeks: (a) a declaration that Defendant Insurers are obligated to pay their full policy limits in satisfaction of Sinclair's cyber insurance claim; (b) damages and interest for breach of contract for Defendant Insurers' refusal to pay Sinclair's cyber insurance claim; and (c) compensatory and general damages for CNA's failure to act in good faith, along with pre-judgment and post-judgment interest, attorneys' fees, expenses and costs, and such other further relief as the Court may deem just and proper.

## THE PARTIES

9. Plaintiff Sinclair, Inc. ("Sinclair") is a diversified media company and leading provider of local news and sports. Sinclair is a Maryland corporation with its principal place of business in Hunt Valley, Maryland.

10. Defendant Continental Casualty Company ("CNA") is an insurance company incorporated in the State of Illinois with its principal place of business in Chicago, Illinois. CNA is licensed to do business in the State of Maryland, has written insurance policies covering risks for Maryland citizens, and is otherwise transacting business in the State of Maryland.

11. Defendant Starr Indemnity & Liability Company ("Starr") is an insurance company incorporated in the State of Texas with its principal place of business in New York, New York. Starr has written insurance policies covering risks for Maryland citizens and is otherwise transacting business in the State of Maryland.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this civil case pursuant to Maryland Code, Courts and Judicial Proceedings ("C.J.") §§ 1–501, 3–406, and 3–1701. The subject matter of this suit is subject to the State's judicial power and to the Court's power to declare rights and other legal relations.

13. This Court has personal jurisdiction over CNA under Maryland Code, C.J. § 6–103(b)(1), (b)(2), and (b)(6) and the federal Due Process Clause, as CNA has purposefully availed itself of the privilege of transacting business in Maryland in connection with the instant cause of action. Specifically, on information and belief, CNA delivered the subject insurance policy to Maryland, sent notices relating to the policy to Maryland, and received payment of policy premiums through Maury Donnelly & Parr Inc. in Maryland. CNA also sent communications regarding the adjustment process for Sinclair's claim to Maryland.

4

14. CNA was and remains, at all relevant times, licensed and registered to conduct insurance business in Maryland, lists a Baltimore Branch on its website, sells insurance to policyholders located in Maryland, included a Maryland policyholder endorsement in the policy at issue, and otherwise agrees to cover risks located in Maryland.

15. This Court has personal jurisdiction over Starr under Maryland Code, C.J. § 6–103(b)(1), (b)(2), and (b)(6) and the federal Due Process Clause, as Starr has purposefully availed itself of the privilege of transacting business in Maryland in connection with the instant cause of action. Specifically, on information and belief, Starr delivered the subject insurance policy to Maryland, and received payment of policy premiums through Maury Donnelly & Parr Inc. in Maryland. Starr also sent communications regarding the adjustment process for Sinclair's claim to Maryland.

16. Starr, by the express terms of the policy it issued to Sinclair that is at issue in this Complaint, consented to the jurisdiction of the United States, which includes the state of Maryland, and lists Maryland within its "Mid-Atlantic Region" on its website.

17. Venue is proper in this judicial district under Maryland Code, C.J. § 6–201(a). The negotiation and execution of the subject insurance policy occurred in Baltimore County and Defendant Insurers, upon information and belief, carry on a regular business in Baltimore County by selling insurance policies to insureds located in the county. In the alternative, Sinclair had a right to select Baltimore County as the venue for this action under Maryland Code, C.J. § 6–202(3). *See Leung v. Nunes*, 729 A.2d 956, 959 (Md. 1999).

### CYBER ATTACK ON SINCLAIR AND ITS RESULTING LOSSES

18. Sinclair is a Fortune 500 diversified media company and leading provider of local news and sports. It owns or operates 21 regional sports networks and owns, operates or provides services to 185 television stations in 86 markets. Sinclair's content is delivered through multiple

platforms, including over-the-air, multi-channel video program distributors, and the nation's largest streaming aggregator of local news content, NewsON. Sinclair's main source of income is advertising revenue.

19. On October 17, 2021 (a Sunday), Sinclair's computer servers and workstations were encrypted with ransomware, and the threat actor executed a script that reset the passwords to approximately 10,500 Sinclair user accounts. As a result, Sinclair lost access to a majority of its computer systems.

20. Upon discovering the cyber attack, Sinclair implemented its incident response plan, took measures to contain the incident, launched an investigation, and undertook restoration efforts. The threat actor had encrypted Sinclair's devices as well as the administrative console for Sinclair's backups, causing extensive disruption and interruption to Sinclair's normal business operations.

21. Through Sinclair's response efforts and those of its partners and several entities retained to assist in the response, Sinclair was able to recover and restore its systems by mid-November 2021.

22. Sinclair's business interruption losses and related expenses incurred during and as a direct result of the cyber attack incident totaled more than $70 million.

## SINCLAIR'S CYBER INSURANCE PROGRAM

23. Sinclair had purchased cyber insurance policies to protect it from cyber attacks of the sort that it suffered in October 2021, including to insure potential losses and business interruption that can result from such attacks.

24. Specifically, Sinclair purchased a $50 million integrated cyber insurance program consisting of five $10 million layers insured by, respectively, non-party insurers Axis Insurance

Company ("Axis"), QBE Insurance Corporation ("QBE"), and Philadelphia Indemnity Insurance Company (Philadelphia"), and Defendant Insurers CNA and Starr.

25. Non-party insurer Axis issued to Sinclair the relevant and controlling $10 million primary cyber policy, No. P-001-000347796-02, for the policy period June 1, 2021 to June 1, 2022 (the "Axis Primary Policy"). A true and correct copy of the Axis Primary Policy is attached hereto as Exhibit A.

26. The Axis Primary Policy provides "comprehensive business interruption coverage" to "pay for loss of Business Income the Insured Entity sustains and Extra Expense it incurs during the Period of Restoration because of a . . . System Disruption." Ex. A, at Endorsement No. 13. "System Disruption" is defined as "a measurable and material interruption or suspension of the Computer System that is directly caused by a Cyber Attack." Ex. A, at Endorsement No. 13, Section V.

27. The Axis Primary Policy also promises to "pay the Insured Entity for: 1. Crisis Management Expense; 2. Fraud Response Expense; 3. Public Relations Expense; and 4. Forensic and Legal Expense incurred because of an Enterprise Security Event . . . in excess of the applicable retention and within the applicable Limit of Insurance." Ex. A, at Endorsement No. 3. An Enterprise Security Event is defined to include "unauthorized access to or unauthorized use of the Computer System that directly results in denial or disruption of access of authorized parties." Ex. A, at Endorsement No. 3, Section 7.

28. Non-party insurers QBE and Philadelphia each issued to Sinclair $10 million follow-form excess policies, which afforded excess cyber coverage on the same terms and conditions as the underlying Axis Primary Policy.

29.     Defendant CNA also issued to Sinclair a $10 million follow-form third-layer excess policy, No. 652229492, for the policy period June 1, 2021 to June 1, 2022 (the "CNA Policy"). The CNA Policy follows form to the Axis Primary Policy, meaning that it affords coverage to Sinclair pursuant to the same terms and conditions as the Axis Primary Policy. The CNA Policy attaches above the policy limits afforded to Sinclair by the underlying policy issued by non-party insurer Philadelphia. A true and correct copy of the CNA Policy is attached hereto as Exhibit B.

30.     Defendant Starr also issued to Sinclair a $10 million follow-form fourth-layer excess policy, No. 1000634401211, for the policy period June 1, 2021 to June 1, 2022 (the "Starr Policy"). The Starr Policy follows form to the Axis Primary Policy, meaning that it affords coverage to Sinclair pursuant to the same terms and conditions as the Axis Primary Policy. The Starr Policy attaches above the policy limits afforded to Sinclair by the underlying policy issued by Defendant CNA. A true and correct copy of the Starr Policy is attached hereto as Exhibit C.

31.     Sinclair has paid all required insurance premiums for the CNA Policy and the Starr Policy (collectively, the "Policies").

32.     Sinclair has satisfied all terms and conditions of the Policies.

33.     The Policies were in full force and effect at all pertinent times.

## ALL UNDERLYING INSURERS PAID SINCLAIR'S CLAIM

34.     Sinclair provided timely written notice to its insurers, including CNA and Starr, of the cyber incident and its resulting claim under the Policies.

35.     The primary insurer Axis provided a written coverage analysis acknowledging coverage for the cyber incident and Sinclair's claim. A copy of this letter was provided to CNA. Axis confirmed coverage under several coverage grants and provisions of the controlling Axis Primary Policy, confirmed that Sinclair had experienced a covered "System Disruption," and indicated that it would await Sinclair's submission of lost Business Income and Extra Expense.

8

36. Sinclair's cyber insurers proposed that, to prepare its Business Interruption claim, Sinclair retain as forensic accountants Matson Driscoll & Damico LLP ("MDD"). Sinclair did so and began working with MDD to compile Sinclair's Business Interruption claim.

37. The excess insurers also hired their own forensic accounting firms to evaluate Sinclair's Business Interruption claim, including Lowers Forensics International ("Lowers") and J.S. Held.

38. MDD submitted Sinclair's Business Interruption claim to Sinclair's insurers, including CNA and Starr, in May 2022. That claim documented losses resulting from the cyber incident totaling more than $70 million.

39. After Sinclair furnished MDD's report and submission, all insurers underlying CNA paid their policy limits.

40. Specifically, the primary insurer Axis paid its $10 million policy limit in July 2022.

41. The first-layer excess insurer QBE paid its $10 million in limits thereafter. In connection with this policy limits payment, QBE wrote: "This will confirm that QBE has confirmed that the covered business interruption loss and incident response expenses incurred by Sinclair as a result of this event exhaust QBE's first excess layer." CNA was included on this correspondence.

42. The second-layer excess insurer Philadelphia noted its understanding as early as April 2022 that Sinclair's claim "will exceed all of their underlying primary and excess coverage limits." Philadelphia later retained J.S. Held (another forensic accountant), upon information and belief, to quantify and verify Sinclair's claim. Philadelphia paid its $10 million policy limits in December 2022 and, subsequent to Philadelphia's retention of J.S. Held, confirmed that it would

not contest Sinclair's claim. Philadelphia's payment, made more than 20 months ago, exhausted the full limits of all policies underlying CNA's third-layer excess policy.

43. Defendant CNA has refused to pay Sinclair's claim under its third-layer excess follow-form policy, as further described below.

44. Defendant Starr has not to date paid Sinclair's claim under its fourth-layer excess follow-form policy, but, on information and belief, Starr indicated a willingness to do so once CNA pays Sinclair's Claim under the CNA Policy which underlies the Starr Policy.

## CNA'S LACK OF GOOD FAITH AND REFUSAL TO PAY SINCLAIR'S CLAIM

45. CNA has acknowledged that Sinclair's claim is a covered claim under the terms of the relevant cyber policies, which consist of the Axis Primary Policy and four follow-form excess policies. CNA's third-layer excess policy is a "follow form" excess policy under which it agreed to "provide coverage in accordance with all of the terms, conditions and limitations" of the "Followed Policy" issued by Axis. CNA's excess policy contains no relevant terms or endorsements modifying the controlling wording of the Axis Primary Policy.

46. In CNA's initial, and only, letter addressing this claim, dated January 3, 2022, CNA acknowledged that its "Excess Policy is subject to the terms, conditions, and exclusions of the primary policy" and requested the "position of [the] primary carrier," which Sinclair provided.

47. Over the ensuing period of more than two years, CNA has never disputed or taken issue with the covered nature of Sinclair's claim. To the contrary and as detailed below, CNA offered repeated assurances that it would soon pay its policy limits in satisfaction of Sinclair's claim.

48. For example, CNA reassured Sinclair's broker in December 2022 that Sinclair's claim was "working through the proper channels."

49. On January 6, 2023, CNA's representative shared that "I am told that I will have the go ahead by the end of January at the latest" and requested Sinclair's wire instruction details in order to make that payment. Sinclair's broker promptly provided the requested wire instructions.

50. On January 31, 2023, CNA's representative again assured Sinclair's broker that CNA's payment would "absolutely happen [on] February 22d and then we should be able to [over]night a check on that same day," that "I'm told by my manager who I just spoke with earlier today" that payment would be by overnight check not wire "for this $10 million payment that we plan to make," and "I also want to reassure that <u>the delay on our end is nothing to do with any sort of issue with the amount. . . . we're not questioning the amount</u>," and "it's the expectation that it's our . . . full $10 million limit." (Emphasis added.)

51. Despite CNA's repeated assurances of imminent payment and that CNA did not have "any sort of issue with the amount" of the loss, CNA subsequently reversed course.

52. First, after its January 2023 assurances of imminent payment, CNA essentially "went silent" on this claim for a seven-month period from March to October of 2023.

53. Then, on October 4, 2023, CNA wrote for the first time that it "views that the submitted BI claim as reviewed against the policy falls below the Philadelphia attachment point let alone the attachment point of CNA."

54. In response to Sinclair's requests for a written explanation of CNA's change in position, CNA provided, on October 18, 2023, a revised report from its forensic accountants at Lowers, dated March 14, 2023, saying that this report "form[s] the basis of the message . . . on October 4, 2023." This revised Lowers report purported to quantify Sinclair's business interruption loss as approximately $10.8 million, in stark contrast to Lowers' prior assessment that

Sinclair loss was roughly $42 million for the broadcast portion of Sinclair's business alone, as described below in Paragraph 56.

55. The revised Lowers report upon which CNA says it relied to withhold its promised payment represents a 180-degree reversal from Lowers' prior assessment of Sinclair's claim. This reversal, upon information and belief, was engineered by CNA in bad faith and without basis in or regard for its policy obligations.

56. Specifically, in October of 2022 – one year before issuing its CNA-directed revised report – Lowers informed MDD (Sinclair's forensic accountants) that Lowers had concluded that Sinclair's broadcast segment (one of two impacted Sinclair business segments) alone had experienced a "Total Business Interruption Loss" of approximately $42 million. This approximately $42 million broadcast segment loss by itself was enough to exhaust the CNA policy, even before consideration of other covered elements of Sinclair's claim such as its Extra Expenses and its non-broadcast segment losses.

57. Consistent with the above findings, by December 9, 2022, Lowers informed Sinclair's forensic accountants at MDD that "[w]e are finalizing our report" and Lowers suggested a telephonic meeting to discuss the claim further, to which MDD agreed. After MDD followed up in January 2023, Lowers wrote, on January 12, 2023, "My apologies for the delayed response we had a call with earlier this week with the Star[r] and CNA adjusters to discuss our calculations. We answered all their questions and we were told to submit our final bill. NO additional working is needed at this time." MDD wrote back that same day, noting that Starr and CNA "were the last two" insurers yet to pay and adding: "Just want to confirm it appears we are above the $50 million?" Lowers responded: "<u>Yes it is above $50M. They are the last 2 layers.</u> . . . Appreciate your patience and professionalism." (Emphasis added.)

58. In March 2023, more than six weeks after Lowers had confirmed that Sinclair's losses exhausted CNA's policy and more than a month after CNA informed Sinclair that its payment would "absolutely happen," Sinclair's insurance broker contacted Lowers to discuss the claim and its status. Lowers was initially responsive and sent a call invitation for March 28, 2023. Shortly before the March 28th call was to take place, however, Lowers canceled – on information and belief on instructions from CNA – and did not further engage with Sinclair.

59. Seven months later on October 18, 2023, CNA provided to Sinclair the revised Lowers report (which is dated March 14, 2023) in which Lowers reduced Sinclair's previously-acknowledged loss amount by more than $30 million. While the revised Lowers report states that "[t]he purpose of this report is to provide QBE, CNA, Starr Companies and Philadelphia Insurance Companies with our analysis and subsequent calculation of the business interruption loss suffered by Sinclair," QBE and Philadelphia had paid their limits well before March 2023. After the revised Lowers report, Philadelphia retained its own forensic accountant, J.S. Held, but Philadelphia ultimately maintained its position that it had to pay its $10 million in limits. Meanwhile, Starr has given no indication that it supports or has relied upon the revised Lowers report.

60. CNA has refused, despite requests from Sinclair, to furnish any written explanation supporting its no-coverage position, beyond sending the revised Lowers report.

61. Instead, on March 11, 2024, counsel for CNA sent an extensive list of additional requests for information including at least 43 subparts, followed by a spreadsheet with additional requests on April 3, 2024. CNA represented that it sought the information to reconsider its coverage position. Based on CNA's representations, Sinclair provided responsive information on March 22, 2024 and May 28, 2024. CNA still has not provided any coverage position to Sinclair.

### FIRST CLAIM FOR RELIEF

### Declaratory Judgment (CNA and Starr)

62. Sinclair repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 61 of this Complaint, inclusive, as though set forth fully herein.

63. Under the Policies, for which substantial premiums have been paid and all other applicable conditions satisfied, the Defendant Insurers are contractually obligated to indemnify Sinclair for its lost Business Income and Extra Expense as a result of the October 17, 2021 cyber attack.

64. The Defendant Insurers have unreasonably withheld payment under their insurance contracts in connection with the above losses.

65. The Defendant Insurers refuse to acknowledge their obligation to pay for Sinclair's lost Business Income and Extra Expense.

66. An actual and justiciable controversy exists between Sinclair and the Defendant Insurers concerning the Defendant Insurers' contractual duties to indemnify their policyholder with respect to Sinclair's lost Business Income and Extra Expense resulting from the October 17, 2021 cyber attack. The controversy is of sufficient immediacy to justify the issuance of declaratory relief.

67. Pursuant to Maryland Code, C.J. §§ 3–406 and 3–1701(d), Sinclair seeks a judicial declaration that CNA and Starr are obligated to indemnify Sinclair for the full amount of Sinclair's lost Business Income and Extra Expense resulting from the October 17, 2021 cyber attack.

### SECOND CLAIM FOR RELIEF

### Breach of Contract (CNA and Starr)

68. Sinclair repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 67 of this Complaint, inclusive, as though set forth fully herein.

69. Under the Policies, for which substantial premiums have been paid and all other applicable conditions satisfied, the Defendant Insurers are contractually obligated to indemnify Sinclair for its lost Business Income and Extra Expense as a result of the October 17, 2021 cyber attack.

70. Despite Sinclair's requests and detailed claim submissions, the Defendant Insurers refuse to acknowledge their obligation to pay Sinclair's lost Business Income and Extra Expense as a result of the October 17, 2021 cyber attack.

71. The Defendant Insurers' refusal to pay for Sinclair's losses constitute a breach of their obligations under the Policy.

72. As a direct and proximate result of their breach of contract, the Defendant Insurers have deprived Sinclair of the benefits of the insurance coverage for which substantial premiums were paid. Sinclair is thus entitled to money damages, including interest according to law.

73. As a result of the Defendant Insurers' withholding of coverage, Sinclair has been forced to expend time and resources supplementing its claim submissions to no avail.

74. Sinclair's damages as a result of the Defendant Insurers' breach of contract are continuing, and Sinclair reserves the right to seek the full and exact amount of its damages at the time of trial.

### THIRD CLAIM FOR RELIEF

**Failure to Act in Good Faith Under Maryland Code, C.J. § 3-1701 (CNA)**

75. Sinclair repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 74 of this Complaint, inclusive, as though set forth fully herein.

76. CNA is an "Insurer" under Maryland Code, C.J. § 3–1701(a)(6) and Maryland Code, Insurance § 1-101.

77. The CNA Policy is "Commercial Insurance" under Maryland Code, C.J. § 3-1701(a)(3) and Maryland Code, Insurance § 27-601.

78. The CNA Policy was issued, sold, or delivered in Maryland, and Sinclair's claim is a first-party claim under the Policy.

79. The CNA Policy has an applicable limit of liability in excess of $1,000,000.

80. CNA has breached its contractual obligations under the CNA Policy.

81. This civil action seeks to determine coverage under the CNA Policy and the extent to which Sinclair is entitled to receive payment for its covered losses from CNA; to determine that CNA failed to act in good faith; and to recover CNA's actual damages under the CNA Policy, its expenses and litigation costs—including reasonable attorney's fees, and pre-judgment interest on all actual damages, expenses, and litigation costs at the rate allowed by law.

82. CNA had an obligation to act in good faith by making an informed judgment about coverage based on honesty and diligence supported by evidence CNA knew or should have known at the time it made a decision on Sinclair's claim, under Maryland Code, C.J. § 3-1701.

83. CNA failed to act in good faith, in violation of Maryland statutory law, including without limitation Maryland Code, C.J. § 3-1701, by: (i) failing to investigate Sinclair's claim within the 45-day time period specified by Maryland's Standards for Prompt Investigation of Claims, COMAR 31.15.07.04(B); (ii) failing to promptly notify Sinclair, in writing, of the actual reason that additional time was necessary to complete CNA's investigation, (iii) failing to provide such written notice to Sinclair every 45 days thereafter until coverage was affirmed or denied, as required by COMAR 31.15.07.04(B); (iv) otherwise failing to investigate or adjust Sinclair's insurance claim within a reasonable time period; (v) refusing to provide meaningful responses to Sinclair's claim submissions and requests for updates; (vi) refusing to engage in serious

negotiation or discussion efforts that could have facilitated the prompt resolution of the coverage dispute and mitigated prejudice to Sinclair; (vii) arbitrarily and capriciously refusing to pay coverage owed Sinclair for lost Business Income and Extra Expense despite Sinclair's entitlement to such coverage; (viii) arbitrarily and capriciously withholding coverage for lost Business Income and Extra Expense despite CNA's knowledge that CNA's own consultant estimated a loss of approximately $42 million for only a portion of Sinclair's claim; (ix) otherwise arbitrarily and capriciously withholding coverage owed Sinclair under Sinclair's well-documented and well-supported claim, in violation of COMAR 31.15.07.03(A)(3); (x) withholding payment from Sinclair with a conscious disregard or reckless indifference to the facts and with no reasonable basis for doing so; (xi) vexatiously valuing Sinclair's claim at substantially less than it is entitled to recover so as to compel Sinclair to institute litigation to recover amounts due on the Policy; (xii) upon information and belief, misrepresenting the actions CNA and its agents took in evaluating Sinclair's claim submission; and (xiii) otherwise failing to act in good faith in settling and paying Sinclair's first-party claim for business interruption, in violation of COMAR 31.15.07.03(A)(3).

84. The judgments, actions and failures listed in the immediately preceding paragraph were made without honesty and without diligence.

85. The evidence CNA knew or should have known at the time of its decisions does not support the judgments CNA made regarding Sinclair's claim.

86. Accordingly, CNA has failed to act in good faith, in violation of Maryland Code, C.J. § 3-1701.

87. Sinclair is therefore entitled to actual damages under the policy, expenses and litigation costs, attorneys' fees, and pre- and post-judgment interest at the statutory rate of ten

percent (10%) per annum—computed from no later than October 4, 2022, the date when CNA should have determined the full value of Sinclair's losses exceeded the CNA Policy limits—pursuant to Maryland Code, C.J. §§ 3-1701(e) and 11-107(a).

88. Sinclair's damages as a result of CNA's failure to act in good faith are continuing, and Sinclair reserves the right to seek the full and exact amount of its damages at the time of trial.

### Prayer for Relief

WHEREFORE, Sinclair prays for relief as follows:

89. On the First Claim for Relief, that this Court enter a declaratory judgment in favor of Sinclair and against Defendant Insurers, declaring that Defendant Insurers are obligated to pay their full policy limits in satisfaction of Sinclair's cyber insurance claim resulting from the October 17, 2021 cyber attack.

90. On the Second and Third Claims for Relief:

   a. Compensatory and general damages in an amount in excess of $1,000,000, including consequential damages as allowed by law;

   b. Expenses and litigation costs incurred by Sinclair in connection with this coverage action; and

   c. Pre-judgment and post-judgment interest, including on all actual damages, expenses, and litigation costs incurred by Sinclair, at the maximum legal rate, based on Maryland Code, C.J. §§ 3-1701(e), 11-107(a), and all other applicable legal provisions.

91. On all Claims for Relief, an award of court costs and attorneys' fees.

92. On all Claims for Relief, such other and further relief as this Court finds just and proper.

## DEMAND FOR TRIAL BY JURY

Sinclair requests a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED.

Dated: September 13, 2024

By: /s/ Matthew J. Schlesinger

Matthew J. Schlesinger (CPF #8912190227)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-5581
mschlesinger@cov.com
Alexis N. Dyschkant
*(motion for special admission to be submitted)*
Megan M. Myers
*(motion for special admission to be submitted)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
(202) 662-6000
adyschkant@cov.com
memyers@cov.com

*Attorneys for Plaintiff Sinclair, Inc.*