**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

CHAMBERS OF
J. Mark Coulson
UNITED STATES MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
P: (410) 962-4953 | F: (410) 962-2985
mdd_jmcchambers@mdd.uscourts.gov

April 28, 2025

LETTER ORDER AND OPINION TO COUNSEL

RE:     *Sinclair, Inc. v. Continental Casualty Company et al.*
        Civil No. 1:24-cv-03003-SAG

Dear Counsel:

Plaintiff, Sinclair, Inc. ("Sinclair"), brought this action against Defendants, Continental Casualty Company ("CCC") and Starr Indemnity & Liability Company ("Starr"), alleging breach of contract based on Defendants' refusal to pay their respective $10 million cyber policy limits for losses Sinclair suffered due to an October 2021 cyberattack. Sinclair additionally filed a claim against CCC for bad faith claims handling practices under the Maryland Code. Md. Code Ann., Cts. & Jud. Proc. § 3-1701. This matter was referred to the undersigned for discovery and all related scheduling by United States District Judge Stephanie A. Gallagher on April 8, 2025. (ECF No. 70). Currently before the Court are multiple discovery disputes concerning CCC's responses to Sinclair's Requests for Production of Documents and answer to Interrogatory No. 4. The issues have been fully briefed in the position letters submitted by Sinclair and CCC, (ECF Nos. 69, 74), and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons set forth below, the Court shall GRANT in part and DENY in part Sinclair's requests.

I.      **Background**

Pertinent to the pending dispute, the parties explain that CCC and Starr are excess insurers—AXIS Insurance Company, who is not a party to this litigation, held the primary layer policy, while CCC and Starr held the follow-form third- and fourth-layer excess policies, respectively. (ECF No. 69 at 2; ECF No. 74 at 1-2). A key issue in this lawsuit is the interpretation of policy language ("loss of" "Business Income"), which CCC contends precludes coverage for basic operating expenses Sinclair paid while it was shut down during the 2021 cyberattack. *Id.* Sinclair maintains that basic operating expenses are covered by the policies, pointing to the fact that the policies do not contain a continuing expenses exclusion. (ECF No. 69 at 1). Sinclair further notes that primary policies CCC issued to it in prior years *did* contain a continuing expenses exclusion. *Id.*

On February 25, 2025, the parties appeared before Judge Gallagher for oral argument on Defendants' motions for judgment on the pleadings. (ECF No. 68). Judge Gallagher denied both motions, concluding the contractual language at issue was ambiguous. *Id.* at 60. She declined to consider the parties' arguments regarding discovery, but noted that based on the recent Maryland Supreme Court opinion *Lithko Contracting, Inc. v. XL Insurance America, Inc.*, she believed "there is context-related evidence that is pertinent to an assessment" in this matter, and further explained there exists sufficient ambiguity in the contract so as "to warrant some discovery as to both the

1

context and the parties' intent at the time that the policy was entered." *Id.* at 60-61; *see generally Lithko Contracting, Inc. v. XL Ins. Am., Inc.*, 318 A.3d 1221 (Md. 2024). The undersigned is accordingly guided by Judge Gallagher's finding of ambiguity in the relevant policies, as well as her reading of *Lithko*, in evaluating the present discovery disputes.

## II.    Analysis

### a.    *CCC's Understanding Prior to and During the CCC Policy Execution (Interrogatory No. 4, Requests for Production Nos. 4-6, 16, 23-25)*

Sinclair seeks production of the following documents:

Request for Production No. 4: All documents and communications concerning the drafting, interpretation, or meaning of the definition of "business income" in the AXIS Policy.

Request for Production No. 5: All documents and communications concerning the drafting, interpretation, or meaning of the definition of "net profit" in the AXIS policy.

Request for Production No. 6: All documents and communications from 2016 to present concerning the interpretation of the definition of "business income" or the term "net profit" in any cyber policy issued by [CCC] in connection with an insurance coverage claim, including statements made or positions taken by [CCC] with respect to these terms, including in litigation or arbitration.

Request For Production No. 16: All underwriting manuals (i) that concern cyber coverage or business interruption coverage and (ii) that were in effect during the underwriting of the [CCC] policy and/or [CCC] primary policies, including underwriting manuals concerning business interruption coverage.

Request for Production No. 23: The underwriting files for the [CCC] primary policies.

Request for Production No. 24: All documents and communications concerning your quotes, proposals, or marketing for insurance coverage related to [CCC's] participation in Sinclair's insurance program from January 1, 2021, including regarding the [CCC] policy and for coverage other than that provided in the [CCC] policy.

Request for Production No. 25: Any and all business interruption forms used by you from 2016 to present.

(ECF No. 69-3 at 9-19). Sinclair additionally asks that the Court order Sinclair to answer Interrogatory No. 4, which seeks identification of:

[A]ll persons and entities who participated in or have knowledge of the drafting of any language defining business income or first party loss in or incorporated into [CCC] primary policies, any preliminary and prior drafts, versions, or iterations of

2

such policy, or any form language, specimen forms, and policy wordings that were the basis, in full or in part, of such policy, and describe the role each such person or entity played in connection therewith.

(ECF No. 69-2 at 10).

With respect to Request for Production Nos. 4 and 5, CCC indicates that it conducted a "reasonable search" and did not identify any responsive documents, notwithstanding its objection that "CCC was not the drafter of the AXIS primary policy." (ECF No. 74 at 2). The Court will therefore direct CCC to include this representation in a supplemental written response to Sinclair's Request for Production of Documents, which should accompany the documents produced in accordance with later portions of this Order.[1]

CCC broadly objects to producing documents other than those related to what it deems to be the only three relevant contracts in this matter: the AXIS primary policy, the CCC follow-form third-layer excess policy, and the Starr follow-form fourth-layer excess policy (all of which were in force at the time of the 2021 cyberattack and form the basis for this lawsuit). (ECF No. 74 at 2-3).[2] CCC therefore asks the Court limit discovery in this matter solely to these three contracts, arguing that the information Sinclair seeks regarding policies it issued to Sinclair between 2016 and 2020 is irrelevant. *Id.* CCC also distinguishes the 2021-2022 excess policy from four prior policies providing coverage between 2016 and 2020 because the earlier policies "involved CCC's coverage afforded to Sinclair as a *primary* insurer" rather than as an excess insurer. *Id.* (emphasis in original).[3] CCC further objects on the grounds that Sinclair's requests are unduly burdensome and disproportionate to the needs of the case. *Id.*

Sinclair responds that information regarding earlier policies is relevant to understanding the context and intent of the parties at the time they entered into the 2021-2022 policy, and that such extrinsic evidence is discoverable given Judge Gallagher's holding that the policy language is ambiguous. (ECF No. 69 at 3). By way of example, Sinclair proposes the underwriting files "may demonstrate [CCC's] practice of excluding continuing expenses explicitly when [CCC] does not intend to offer full business interruption coverage[,]" and argues that documents reflecting the parties' understanding of "business interruption coverage and the calculation of business income losses" are plainly relevant to CCC's course of dealing and intent at the time the 2021-2022 policy was executed. *Id.* at 4. Sinclair additionally notes that CCC requested information for the same topics to Sinclair's insurance broker in a third-party subpoena, arguing CCC "cannot refuse to produce evidence of the parties' understanding" while seeking its own such discovery from third parties." *Id.*[4]

Both parties rely on *Lithko* in support of their positions. CCC cites *Lithko* for the proposition that, "[i]f a court finds ambiguity, it must consider any extrinsic evidence that sheds

---

[1] Under Federal Rule of Civil Procedure 26(g), at least one attorney must sign a document production, which certifies that the production is complete to the best of the attorney's knowledge, information, and belief, formed after a reasonable inquiry. Fed. R. Civ. P. 26(g).

[2] CCC indicates that "[u]nless otherwise stated, the CCC Excess Policy and the Starr Excess Policy follow form to the Axis Primary Policy." (ECF No. 74 at 2).

[3] One policy, providing coverage from June 2020 to June 2021, was an excess policy. (ECF No. 74 at 2).

[4] CCC represents that it served this subpoena merely out of an "abundance of caution," in light of the case management order setting a deadline for third party subpoenas of April 2, 2025. (ECF No. 74 at 5).

light on the intentions of the parties **at the time of the execution of the contract.**" (ECF No. 74 at 3) (emphasis in original) (citing *Lithko*, 318 A.3d at 1231). CCC avers, under *Lithko*, any documents or communications regarding "business interruption and cyber coverage *before* June 1, 2021 [are] wholly irrelevant to determine the parties' intention *at the time of execution* of the 2021 [r]elevant [p]olicies." *Id.* (emphasis in original). The Court does not agree with CCC's reading of *Lithko*. *Lithko* emphasizes that contractual language is not interpreted in a vacuum, explaining Maryland courts interpret contractual language "in context, which includes not only the text of the entire contract also the contract's character, purpose, and the facts and circumstances of the parties at the time of execution." *Lithko*, 318 A.3d at 401-02 (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310-11 (Md. 2019)). While the scope of relevant context does not ordinarily extend to evidence of the parties' subjective intent, once a court has determined that the relevant contractual language is ambiguous, such evidence may be considered. *Id.* Given that Judge Gallagher has determined the policy language is ambiguous, information concerning the parties' intentions at the time of contracting is certainly discoverable.

Additionally, the Court does not view *Lithko's* language limiting extrinsic evidence of the parties' intentions to "the time of the execution of the contract" as supporting CCC's argument that any evidence predating the contract is irrelevant. Prior policies, and the documents underlying them, could certainly inform and explain the parties' intentions at the time the 2021-2022 excess policy was executed. For example, if it is the case, as Sinclair alleges, that earlier policies included a clause excluding continuing expenses, the fact that a continuing expense exclusion was not featured in the 2021-2022 policies could provide evidence of what the parties intended the 2021-2022 policy to encompass.

Finally, the undersigned is not persuaded that Sinclair's requests are overly burdensome and disproportionate to the needs of this case. CCC frequently points to the fact that the records Sinclair seeks were issued as far back as nine years ago. This is somewhat misleading, although technically accurate. The cyberattack occurred in October 2021, and the policies in place at time provided coverage starting in 2021. This means that Sinclair is actually seeking records from five years prior to the contract at issue. The Court finds this is a reasonable timeframe under the circumstances.

The Court will accordingly deny CCC's request to limit discovery to the 2021-2022 policies, and grant Sinclair's requested relief. CCC is directed to respond to Request for Production Nos. 4-6, 16, and 23-25, as well as Interrogatory No. 4, to include documents and information relating to the policies CCC issued to Sinclair from 2016 to 2021 (both excess and primary policies).[5]

      *b.   Forensic Accountants' Interpretation and Application of the Disputed Language (Request for Production No. 11)*

Sinclair seeks "documents and communications concerning any third party's assessment or analysis of the value or quantification of the cyber claim and their interpretation of the definition of 'business income' or the term 'net profit[.]'" (ECF No. 69-3 at 12). Sinclair notes that it is aware of at least three accounting firms which reviewed its cyber claim on behalf of CCC and notes that

---

[5] The Court acknowledges that CCC has produced some documents in response to Request for Production Nos. 16 and 24, to the extent that they related to the 2021-2022 excess policy. (ECF No. 74 at 4).

CCC's own adjuster "issued reports in October 2022 and December 2022 that reduced Sinclair's lost revenue only by saved or avoided expenses, and not continuing operating expenses." (ECF No. 69 at 4). Thus, Sinclair argues, documents and communications relating to these reports, as well as other forensic accountants who reviewed the cyber claim, are relevant to CCC's views of the disputed terms and "the common industry understanding of how business interruption claims are calculated under similar language." *Id.* at 5. Sinclair further contends that these documents are relevant to whether CCC handled Sinclair's cyber claim in good faith, and notes that CCC seeks the same information from Sinclair's accountants. *Id.*

CCC states it will "produce responsive, non-privileged documents from CCC's underwriting file and claim file" as well as "responsive, non-privileged communications, if any, from reasonable email searches within CCC" but maintains that no documents related to a third party's interpretation of the policy language are relevant. (ECF No. 69-3 at 12; ECF No. 74 at 6).[6] CCC argues that any communications occurring after the execution of the policy in June 2021 cannot possibly have any bearing on the parties' intentions when the contract was formed and are therefore not discoverable.

Regardless of any relevance of these documents to Sinclair's breach of contract claim, they are certainly relevant to Sinclair's second count against CCC, which is predicated on whether or not CCC acted in good faith in handling Sinclair's cyber claim. *See Barry v. Nationwide Mut. Ins. Co.*, 298 F. Supp. 3d 826, 830 (D. Md. 2018) (explaining that the standard of good faith under Courts & Judicial Proceedings § 3-1701 is judged under the totality of the circumstances, including (1) "efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way as to limit any potential prejudice to the insureds;" (2) "the substance of the coverage dispute or the weight of legal authority on the coverage issue;" and (3) "the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage.") (citations omitted). CCC is therefore directed to respond to Request for Production No. 11. Of course, CCC may raise attorney client or other privileges where appropriate.

### c.  *Claim Manuals (Request for Production No. 17)*

CCC indicates that it has now produced the claim manuals responsive to Request for Production No. 17. Sinclair's request shall therefore be denied as moot.

### d.  *Loss Reserves (Request for Production No. 12)*

Sinclair next requests production of "[a]ll documents concerning [CCC's] calculation or setting of loss reserves relating to the [c]yber [c]laim." (ECF No. 69-3 at 13). CCC objects on the grounds that "such information is irrelevant to the subject matter of this litigation, including but not limited to the reason that reserves may be set for public policy and/or regulatory reasons." *Id.*

---

[6] Each of CCC's written responses to Sinclair's Request for Production of Documents almost uniformly raise objections that the request is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and is outside the scope of permissible discovery. (ECF No. 69-3). Given the breadth of these objections, the Court will focus its analysis on the objections CCC raises in its position letter. (ECF No. 74).

CCC explains that "loss reserve information is irrelevant to insurance coverage disputes because reserves reflect purely internal business judgments rather than legal evaluations of coverage, and are inherently hypothetical and contingent."  (ECF No. 74 at 7).  Sinclair maintains that loss reserves are particularly relevant in cases like this one, "where an excess insurer challenges the claim valuation and alleges that the claim does not reach its layer" and are additionally relevant to its bad faith claim. (ECF No. 69 at 6).

Federal Rule of Civil Procedure 26(b)(1) provides that:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "[I]t is well understood that pursuant to Rule 26(b)(1) relevancy is construed liberally[,]" and the party resisting discovery bears the burden of establishing why the discovery sought is not relevant. *Nat'l Credit Union Admin. v. First Union Cap. Mkts. Corp.*, 189 F.R.D. 158, 161 (D. Md. 1999) (first citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978), then citing *Spell v. McDaniel*, 591 F. Supp. 1090, 1114 (E.D.N.C. 1984)).

The Court concludes that CCC has not met its burden of demonstrating that the loss reserves are not relevant. CCC's arguments that loss reserves are purely based on internal business judgment and are often set for regulatory reasons may speak to the weight of such evidence, or be reasons why they do "not necessarily mean that the insurers believed that such claims would be covered by the policies." (ECF No. 74 at 8) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.*, 558 A.2d 1091, 1097-98 (Del. Super. Ct. 1989)). The Court does not view this reasoning, however, as categorically rendering loss reserves outside the scope of discovery, particularly in cases where the plaintiff alleges bad faith. *U.S. Fire Ins. Co. v. City of Warren*, No. 2:10-CV-13128, 2012 WL 1454008, at *11 n.5 (E.D. Mich. Apr. 26, 2012) ("The courts are split as to whether reserve information is relevant in a suit alleging a bad faith failure to settle or other type of bad faith.") (citations omitted); *Diamond Rock Hospitality Company v. Certain Underwriters at Lloyd's of London*, 72 V.I. 185, 197 (2019) (adopting "the rule that reserve information is not discoverable but may become discoverable pursuant to a bad faith claim.").[7]

CCC additionally raises a concern that loss reserve documents generated after the denial of coverage were prepared in anticipation of litigation and are thus shielded by the work product doctrine. (ECF No. 74 at 7). To the extent that CCC's response to Request for Production No. 12 would include documents created after the coverage dispute had arisen, CCC may object to their production on those grounds. Such objection should be specifically noted and the Court is willing to consider the parties' positions on this issue, pursuant to the informal discovery dispute process outlined in the undersigned's memorandum to the parties, if needed. (ECF No. 71).  Otherwise,

---

[7] CCC cites both cases in support of its position, but does not address their holdings in relation to Sinclair's bad faith claim. (ECF No. 74 at 8).

CCC is directed to provide the loss reserves information sought prior to the denial of coverage, provided that such information exists.

     *e.  Reinsurance Policies and Communications (Request for Production Nos. 18-20)*

Finally, Sinclair seeks information concerning CCC's reinsurance policies:

Request for Production No. 18: Any policy (or policies) of reinsurance issued to [CCC] which reinsure the [CCC] Policy ("Reinsurance Policy").

Request for Production No. 19: All documents and communications concerning whether the Reinsurance Policy provides coverage to [CCC] for the cyber claim.

Request for Production No. 20: All documents and communications shared between [CCC], on the other hand, and [CCC's] reinsurer(s), retrocessionaire(s), or their representatives, on the other hand, concerning the cyber claim, the [CCC] policy, or any reinsurance policy.

(ECF No. 69-3 at 15-16). CCC contends that the reinsurance policies, and all documents relating to them, "primarily reflect internal business judgments aimed at managing risks, rather than analysis relevant to interpreting coverage obligations" and are therefore not subject to discovery. (ECF No. 74 at 10). Sinclair argues that the documents sought are relevant to its bad faith claim, and may, for example, reveal a discrepancy between CCC's denial of Sinclair's cyber claim and a conflicting viewpoint expressed by CCC in communications with its reinsurer. (ECF No. 69 at 7).[8]

Courts have reached different outcomes on this issue: some have held that reinsurance information is not discoverable in cases involving coverage disputes between an insurer and insured, while others have held that it is relevant—particularly in cases involving a bad faith claim. *See, e.g.*, *Warren*, 2012 WL 1454008, at *10 (denying motion to compel production of reinsurance information because "reinsurance involves a business decision, not a legal determination regarding policy interpretation or coverage.");[9] *TIG Ins. Co. v. Tyco Int'l.*, No. 3:08–cv–1584, 2010 WL 4683594, at *2 (M.D. Pa. Nov. 12, 2010) (denying discovery of reinsurance agreement between insurer and reinsurer as not relevant to dispute regarding interpretation of underlying policy); *U.S. Fire Ins. Co. v. Bunge N. Am., Inc.*, 244 F.R.D. 638, 642-43 (D. Kan. 2007) (finding no error in review of magistrate judge's holding allowing discovery of communications between insurer and reinsurer where bad faith was an issue in dispute between insurer and insured); *Imperial Trading Co. v. Travelers Prop. Cas. Co. of Am.*, Civ. No. 06–4262, 2009 WL 1247122, at *3-4 (E.D. La. May 5, 2009) (ordering production of reinsurance agreement and communications between insurer and reinsurer in relation to bad faith claim by insured). As summarized in one opinion:

---

[8] Sinclair also argues that production of the policies is required under Federal Rule of Civil Procedure 26(a)(1)(A)(iv). (ECF No. 69 at 7-8). While it is true that "[n]umerous courts across the country have… held in favor of disclosure of reinsurance policies pursuant to Rule 26(a)(1)(A)(iv)[,]" because Sinclair also seeks production of documents related to the policies, in addition to the policies themselves, the Court will order production on other grounds. *Est. of Brown v. Lambert*, No. 15-CV-1583-DMS-WVG, 2020 WL 3606392, at *4 (S.D. Cal. July 2, 2020) (collecting cases).

[9] Notably, *Warren* does not involve a bad faith claim, and although the court did not order production of documents relating to the reinsurance policies, it did acknowledge that reinsurance policies are discoverable under Federal Rule of Civil Procedure 26(a)(1)(A)(iv)). *Warren*, 2012 WL 1454008, at * 10.

Whether communications between cedents and their reinsurers are discoverable appears to be dependent on the nature of the issues to which they are alleged to be relevant.... [C]ourts appear reluctant to permit discovery of communications between cedents and their reinsurers for the purpose of establishing the proper interpretation of an unambiguous insurance policy, but are more willing to permit discovery for other purposes, such as defending against an insurer's effort to rescind a policy; to deny claims for late notice; to reconstruct a lost policy; or as extrinsic evidence of an ambiguous policy provision.

*U.S. Fire Ins. Co.*, 244 F.R.D. 638, 643 (quoting *Medmarc Cas. Ins. Co. v. Arrow Int'l, Inc.*, No. CIV A 01 CV 2394, 2002 WL 1870452, at *3-4) (E.D. Pa. July 29, 2002)). Thus, as is the case with many discovery issues, the Court will review the parties' arguments in light of the facts particular to this case and the present dispute. *Id.* (agreeing that the discoverability of reinsurance information "should be decided on a case-by-case basis, considering the particular claims and defenses asserted by the parties.").

Here, the undersigned is persuaded that the reinsurance policies, as well as related documents and communications, are relevant to Sinclair's bad faith claim and should be produced. Specifically, the documents are relevant to CCC's handling of Sinclair's claim and CCC's understanding of the amount it owed Sinclair under the policy. *See Imperial Trading Co.*, 2009 WL 1247122, at *3 (explaining reinsurance information may be used "to point out inconsistencies in [the insurer's] stated positions, or otherwise show that [the insurer] did not act in good faith reliance…in adjusting plaintiff's claims.").

As a final note, Request for Production No. 20, as currently phrased, seeks information which is likely not relevant or proportional to the needs of this case. Sinclair requests production of: "[a]ll documents and communications shared between [CCC], on the other hand, and [CCC's] reinsurer(s), retrocessionaire(s), or their representatives, on the other hand, concerning the cyber claim, the [CCC] policy, or <u>any reinsurance policy.</u>" (ECF No. 69-3 at 16) (emphasis added). As written, this could theoretically encompass communications related to *any* reinsurance policy CCC has with its reinsurers. The Court will therefore limit Request No. 20 to all documents and communications shared between [CCC] and [CCC's] reinsurer(s) retrocessionaire(s), or their representatives, concerning the cyber claim, the [CCC] policy, or any reinsurance policy providing coverage to CCC for Sinclair's cyber claim.

Sinclair's request as to Request for Production No. 20 will thus be granted in part and denied in part, and its request as to Request for Production Nos. 18 and 19 will be granted.

CCC shall provide discovery in accordance with this Order, to include a supplemental written response to Sinclair's Request for Production of Documents, within thirty (30) days. As this Court did not consider arguments regarding work product privilege, attorney client privilege, or any other privilege, objections on those grounds may of course be invoked where appropriate. The parties are reminded to adhere to the informal discovery dispute process outlined at ECF No. 71 for all future discovery disputes which arise.

Notwithstanding its informal nature, this letter constitutes an order of the Court and should be docketed as such.

8

Sincerely yours,

 /s/

J. Mark Coulson
United States Magistrate Judge